UNITED STATES of America,
Plaintiff-Appellee,

v.

Charles Eugene MONKS,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Gary A. HOLT, Defendant-Appellant.

Nos. 84–1187, 84–1199.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 13, 1985.

Decided Oct. 21, 1985.

Jon Rick Cooper, Asst. U.S. Atty., Tucson, Ariz., for plaintiff-appellee.

Nancy Postero, Keller & Postero, Tucson, Ariz., for C. Monks.

Jeffrey D. Bartolino, Tucson, Ariz., for G. Holt.

Before DUNIWAY and CHOY, Senior Circuit Judges, and FARRIS, Circuit Judge.

CHOY, Senior Circuit Judge:

Charles Eugene Monks and Gary A. Holt were convicted of bank robbery in violation of 18 U.S.C. § 2113(a) and § 2. This is a consolidated appeal from their convictions.

The Union Bank in Arizona was robbed by a lone gunman on December 6, 1983. At trial, James White, a convicted bank robber and informant, testified that Holt and Monks came to his mother's apartment on December 6, and Monks told him that he and Holt had just robbed the Union Bank using the car of a friend, Marilyn Daniels. White testified that Holt brought in some clothes which he asked White to destroy and also brought in a bag of money which Monks divided into two stacks.

A few days after the robbery, White told FBI Agent Gosting about Holt's and Monks' visit and turned over the clothes and money wrapper sticks he had gotten from them, and a gun Holt had left with Daniels. Gosting procured an arrest warrant based in part upon White's revelations, describing White as a "reliable citizen." While Holt and Monks were being held in a correctional center after their

arrest, a correctional officer overheard Monks telling Holt that the only thing Holt had to worry about was getting identified by the camera in the bank and, after a pause with no response from Holt, that he (Monks) was going to try to make them think he was crazy.

Three bank tellers testified that Holt was the bank robber. Two were positive of their identification. Nine days after the robbery, they had each picked Holt's picture out of a photo lineup presented by Gosting after he first showed them a bank surveillance photograph of the robber. During their testimony, two of them inadvertently referred to the lineup photographs as "mugshots."

Although the prosecutor had discussed expected incriminating (to Holt) testimony from a Jan Schwartz in his opening argument, the judge later decided to exclude her testimony. Holt was not allowed to cross-examine White about a prior burglary he might have committed with Monks and a man named "Carlos," who fit the bank robber's general description.

Monks and Holt each moved to have their trials severed both pretrial and during trial. The district court denied their motions.

## ISSUES

1) Did the district court err in denying Monks' claims for severance on the grounds that a) the evidence of Holt's guilt was so overwhelming that it would "rub-off" onto Monks, b) severance was needed to allow him to cross-examine Holt about the conversation in the correctional center?

2) Did the district court err in allowing a) Monks' statement to White that he and Holt had just robbed the bank and b) Monks' comments to Holt at the correctional center, to come in against Holt as adoptive admissions?

3) Did the *Bruton* doctrine require that Holt be granted a severance to protect his right to confront Monks as to Monks' statements mentioned in issue No. 2) above?

4) Was Holt erroneously barred from cross-examining White as to the prior burglary? (Did the district court err in not granting Holt a severance so that he could conduct that cross-examination without incriminating Monks?)

5) Did the district court abuse its discretion in failing to exercise its supervisory power to dismiss the charges against Monks because of Gosting's alleged misrepresentation to the magistrate (who issued the Monks arrest warrant) that White was a "reliable citizen"?

6) Did the district court abuse its discretion in refusing to grant Holt a mistrial because of the two inadvertent references to the lineup photos as "mugshots"?

7) Given that the prosecutor had already mentioned Schwartz' testimony in his opening argument, did the district court abuse its discretion in refusing to grant Holt a mistrial when it decided to exclude the testimony?

8) Should the in-court and out-of-court identifications of Holt by the tellers have been excluded because they were the product of an unduly suggestive photo-lineup procedure and unreliable?

## ANALYSIS

### *Monks' Claims for Severance (Issue No. 1)*

a) Disparity of Proof

Monks claims that he should have been granted a severance because the evidence of Holt's guilt was so overwhelming in comparison with the evidence of Monks' guilt that Holt's guilt would "rub-off" onto Monks because the jury would be unable to keep the evidence separate. This circuit holds that "joinder is the rule rather than the exception and that the burden is on the defendant in his appeal following denial of the motion to sever to show that joinder was so manifestly prejudicial that it outweighed the dominant concern with judicial economy." *United States v. Armstrong,* 621 F.2d 951, 954 (9th Cir.1980).

Regarding Monks' specific contention, this circuit has ruled that a defendant is

not entitled to a severance merely because the evidence against a codefendant is more damaging than the evidence against him. *See United States v. Gaines,* 563 F.2d 1352, 1355 (9th Cir.1977). "While a great disparity in proofs may be sufficient to allow a severance in certain cases, the prime consideration is whether the jury can reasonably be expected to compartmentalize the evidence as it relates to separate defendants in the light of its volume and the limited admissibility." *Id.*

■ First, Monks waived this ground for severance by failing to renew his motion for severance at the close of evidence. *Gaines,* 563 F.2d at 1356. Although he had earlier moved for severance on this ground, his claim is based on an alleged disparity in the amount of evidence to be produced at trial. This court has stated that:

> Where prejudice from joinder appears in the course of trial, it has been held that the request for severance must be renewed at the close of the evidence or it will be treated as waived. Appellant did not renew his request for severance at that point. His failure to do so at least suggests that the prejudice now asserted to have resulted from the joinder may not have seemed so substantial to appellant in the context of trial....

*Williamson v. United States,* 310 F.2d 192, 197 (9th Cir.1962) (footnotes omitted); *see also United States v. Kaplan,* 554 F.2d 958, 966 (9th Cir.) (per curiam) ("Premature motions to sever not diligently pursued as the prejudicial evidence unfolds cannot serve as insurance against an adverse verdict."), *cert. denied,* 434 U.S. 956, 98 S.Ct. 483, 54 L.Ed.2d 315 (1977).

■ Even if Monks' motion had been diligently pursued, however, it must fail on the merits because the jury should have had no difficulty compartmentalizing the evidence. The evidence was straightforward and relatively easy to follow. *See Williamson,* 310 F.2d at 198. All of the evidence was presented in only two days of trial. The three eyewitness identifications by the tellers implicated Holt only and could not have been confused with evidence as to Monks' guilt. The only evidence linking Monks to the robbery came from White's and Daniel's testimony and the testimony about the conversation between Monks and Holt at the correctional center. The jury should have had no problem keeping evidence of Monks' indirect involvement separate from evidence of Holt's direct participation in the robbery.

Finally, the judge took steps to eliminate the potential for prejudice inherent in a joint trial by instructing the jury both during trial and at the close of trial that evidence against one defendant should be considered only against that defendant and that it was their duty to give separate personal consideration to the case of each individual defendant. *See United States v. Kennedy,* 564 F.2d 1329, 1334 (9th Cir. 1977) (rejecting claim for severance in part because of trial judge's similar instructions), *cert. denied,* 435 U.S. 944, 98 S.Ct. 1526, 55 L.Ed.2d 541 (1978).

In sum, the district court did not abuse its discretion, *see United States v. Abushi,* 682 F.2d 1289, 1296 (9th Cir.1982) (standard of review), in denying Monks' motion for severance based on his "rub-off" theory.

b) Inability to Cross-examine

■ Monks also relies on *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), to attack the court's failure to sever. Monks objects to the admission of the conversation between him and Holt at the correctional center because he was unable to cross-examine Holt about the conversation as Holt did not take the stand. However, Monks' *Bruton* claim is misplaced. It was Monks' portion of the conversation that incriminated him, not Holt's. It was Monks who said "the only thing you have to worry about is getting identified by the camera in the bank. (pause) I guess I'm just going to try to make them think I'm crazy." Therefore,

because Monks had no right to cross-examine Holt, severance was not required.[1]

*Holt's Claims for Severance*

Holt claims that Monks' statements to White that he and Holt had just robbed the bank and Monks' comments to Holt at the correctional center were hearsay improperly admitted into evidence as adoptive admissions. He also contends that this raises problems under the *Bruton* doctrine and thus mandates severance.

a) Adoptive Admissions (Issue No. 2)

■ Before admitting a proffered admission by silence under Fed.R.Evid. 801(d)(2)(B), the district court must first find that sufficient foundational facts have been introduced for the jury reasonably to conclude that the defendant did actually hear, understand and accede to the statement. *See United States v. Sears,* 663 F.2d 896, 904 (9th Cir.1981), *cert. denied,* 455 U.S. 1027, 102 S.Ct. 1731, 72 L.Ed.2d 148 (1982); *United States v. Moore,* 522 F.2d 1068, 1076 (9th Cir.1975), *cert. denied,* 423 U.S. 1049, 96 S.Ct. 775, 46 L.Ed.2d 637 (1976). Once admitted, the jury decides whether the defendant actually heard, understood, and acquiesced in the statement. *See Moore,* 522 F.2d at 1075.

i) Monks' Statement to White

The testimony indicates that Monks, White, and Holt were in the bedroom together when Monks told White that he and Holt had just robbed the bank. Indeed, when the prosecutor asked White whether Holt was "in his presence" when Monks said those incriminating words, White replied "yes." Furthermore, Holt made a comment thereafter about how easy the robbery was.[2] A reasonable jury could infer from this evidence that Holt heard and understood Monks' statement.

■ If Holt was innocent, one would expect that Monks' serious accusation would have prompted Holt to respond by denying it or by making some other appropriate response. Holt, however, made no such response and instead commented about how easy the robbery was.[3] In sum, we cannot say the district court abused its discretion, *see United States v. Soulard,* 730 F.2d 1292, 1296 (9th Cir.1984) (standard of review for evidentiary rulings), in finding that a sufficient foundation had been established to allow the question of whether Monks' statement had been adopted by Holt to go to the jury.

ii) Monks' Comments to Holt

■ A reasonable jury could have found that Holt heard and understood the comments made by Monks at the correctional center concerning Holt's possibly being identified by the bank camera and Monks

---

1. Monks also claims that severance should have been granted because his right to cross-examine Jan Schwartz for bias was denied in order to protect Holt. This claim is frivolous because the district judge ultimately refused to allow Schwartz to testify in front of the jury.

   Improper character evidence that Monks used heroin came out when Holt's attorney cross-examined White. A court should not have to grant a severance, however, because of the mere possibility that a co-defendant's attorney might carelessly ask questions at trial that elicit responses incriminating the other co-defendant; that possibility exists in practically any joint trial. However, if improper incriminating evidence does in fact come out, as it did here, the prejudiced defendant can move for a mistrial. Here, however, Monks did not even object at the time the heroin comment was elicited, let alone move for a mistrial. The next day, Monks' attorney merely asked for a limiting instruction, which was given.

2. Holt contends that it is impossible to tell whether his comment was made right after Monks' statement or whether it even occurred in the same place. A close examination of the transcript, however, strongly suggests that Holt's comment occurred in the same place and shortly after Monks' incriminating statement.

3. Holt claims that White's testimony that Holt was "plastered" at the time Monks made the statement lessens the likelihood that Holt heard and acquiesced in the statement. However, Holt was able to comment about how easy the robbery was, participate in the discussion about the police pulling over the wrong car, bring in a bag of clothes and tell White to bury it or burn it, and shave off his mustache. It is therefore doubtful that he could do all of these things and yet not be able to hear Monks' statement or deny it.

trying to make them think he was crazy. Holt had been responding to Monks' other questions immediately preceding Monks' incriminating comments. Nothing in the record suggests that Monks' latter comments were quieter or made under different factual circumstances.

One would expect Holt to have made some kind of response to Monks' comments implying that he (Holt) was involved in a serious crime if he was in fact innocent. Holt contends, however, that because the conversation took place in a holding cell with other inmates and he was being charged with a crime that could land him in prison, the prudent reaction would be to remain silent. Because Monks was making his incriminating statements audibly, however, it is more reasonable to expect Holt to make some exculpatory response, rather than do nothing and give the other inmates reason to believe he was acquiescing in Monks' comments. A jury reasonably could conclude that Holt acquiesced in Monks' comments.[4] The district court did not abuse its discretion in allowing Monks' comments to come in as adoptive admissions.

b) *Bruton* and the Confrontation Clause (Issue No. 3)

Even though Monks' statements against Holt fall within the adoptive admissions "exception" to the hearsay rule, this circuit has held that "application of a recognized hearsay rule exception does not necessarily evidence compliance with the Confrontation Clause." *United States v. Adams*, 446 F.2d 681, 683 (9th Cir.), *cert. denied*, 404 U.S. 943, 92 S.Ct. 294, 30 L.Ed.2d 257 (1971). Although Holt does not specifically raise this issue (he only claims that the statements were not adoptive admissions), he does indirectly raise the Confrontation Clause issue by relying on *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), to support his claim

that the district court's failure to grant him a severance in conjunction with its admission of Monks' statements at their joint trial violates the Confrontation Clause.

Admission of Monks' statements does involve, just as *Bruton* did, the admission of a codefendant's statements incriminating the defendant in a joint trial where the codefendant does not take the stand and therefore cannot be cross-examined by the defendant about his extrajudicial statements. The key difference, here, is that, unlike *Bruton*, the defendant Holt has adopted Monks' incriminating statements, and therefore a recognized hearsay exception is implicated. The Supreme Court in *Bruton*, recognizing this distinction, stated:

> We emphasize that the hearsay statement inculpating petitioner was clearly inadmissible against him under traditional rules of evidence.... There is not before us, therefore, any recognized exception to the hearsay rule insofar as petitioner is concerned and we intimate no view whatever that such exceptions necessarily raise questions under the Confrontation Clause.

*Bruton*, 391 U.S. at 128 n. 3, 88 S.Ct. at 1623 n. 3 (citations omitted). Where a hearsay exception is involved, the Supreme Court has taken a case-by-case approach assessing reliability and unavailability. *See, e.g., Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970). However, it has also declared that:

> the Confrontation Clause normally requires a showing that [the declarant] is unavailable. Even then, his statement is admissible only if it bears adequate 'indicia of reliability.' *Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception.*

*Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980) (emphasis

---

**4.** The correctional officer testified that he would have heard a response by Holt if he had made an audible one. Although it is true that Holt could have responded by a non-audible gesture, because Holt had responded to Monks' other questions audibly, a reasonable jury could find that Holt had not rejected Monks' comments in an inaudible manner. Of course, once the evidence was admitted, the jury was still free to find otherwise.

added). Thus, it would seem that adoptive admissions, being a firmly rooted hearsay exception, would necessarily satisfy the Confrontation Clause. *See United States v. Ordonez,* 737 F.2d 793, 812–13 (1984) (Norris, J., concurring in part). However, this circuit rejects the proposition that firmly rooted hearsay exceptions automatically satisfy the Confrontation Clause at least with regard to the co-conspirator exception. *See, e.g., United States v. Tille,* 729 F.2d 615, 621 (9th Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 156, 83 L.Ed.2d 93 (1984); *United States v. Perez,* 658 F.2d 654, 660 (9th Cir.1981).

Nevertheless, in *United States v. Giese,* 597 F.2d 1170 (9th Cir.), *cert. denied,* 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979), after finding adoptive admissions, this court stated that "[n]either due process, fundamental fairness, nor any more explicit right contained in the Constitution is violated by the admission of the silence of a person, not in custody or under indictment in the face of accusations of criminal behavior." *Id.* at 1197. This suggests that *Giese* considered adoptive admissions to automatically satisfy the Confrontation Clause. *See United States v. McKinney,* 707 F.2d 381, 387 n. 6 (9th Cir.1983) (Belloni, J., dissenting); *see also United States v. Sears,* 663 F.2d 896, 904–05 (9th Cir.1981) (admitting incriminating adopted statement of codefendant without even addressing possible Confrontation Clause problem), *cert. denied,* 455 U.S. 1027, 102 S.Ct. 1731, 72 L.Ed.2d 148 (1982).

■ There is some justification for viewing adoptive admissions as automatically satisfying the Confrontation Clause. The defendant who adopts a statement can always "confront" and rebut his own out-of-court adoptive actions if he chooses to testify. *See McKinney,* 707 F.2d at 387 (Belloni, J., dissenting). However, the admission of adopted statements has, at least in this case, probative value beyond the fact that the adopter may have adopted the statements. Here, the fact that *Monks* has implicated Holt in the robbery, in and of itself, incriminates Holt regardless of whether Holt adopts Monks' implications or not.[5] Therefore, the Confrontation Clause is implicated because Holt is unable to cross-examine Monks as to his accusations. We conclude that adoptive admissions do not automatically satisfy the Confrontation Clause, at least where the third-party statements alleged to have been adopted have probative value independent of the fact that they may have been adopted by the defendant.

Thus, we must now apply the two-part Confrontation Clause analysis: "unavailability of the declarant and reliability suggested by the circumstances of the statement." *Tille,* 729 F.2d at 621. Monks was unavailable because he was a codefendant who did not testify. *See id.; United States v. Arbelaez,* 719 F.2d 1453, 1460 (9th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 3543, 82 L.Ed.2d 847 (1984).[6] The reliability inquiry requires us to balance the following factors: 1) whether the statements are assertions of past fact, 2) whether the declarant had personal knowledge of the facts he related, 3) the possibility of faulty recollection, and 4) whether the circumstances suggest that the declarant misrepresented the defendant's role. *See Dutton v. Evans,* 400 U.S. at 88–89, 91 S.Ct. at 19–220; *Ordonez,* 737 F.2d at 802–03; *Tille,* 729 F.2d at 621.

---

5. In *Giese,* the court avoided this problem by finding that the statements that were adopted were used "merely to lay the foundation for a showing of Giese's failure to deny them" and thus were not offered to prove the truth of the matter asserted. 597 F.2d at 1195. Although that position may have been valid in the factual situation presented in *Giese,* it does not apply here, because Monks' statements, by themselves, incriminate Holt regardless of any possible acquiescence in them by Holt.

6. Although Holt claims that a severance would have allowed him to call Monks to the stand, he made no showing that Monks would not have asserted his constitutional right against self-incrimination. Such an assertion would make Monks unavailable for purposes of the Confrontation Clause. *See McKinney,* 707 F.2d at 383 n. 1.

Monks' statement to White that he and Holt had just robbed the bank is an assertion of past fact. Monks' comments to Holt that the only thing he had to worry about was getting identified by the bank camera and that he would try and make them think he was crazy are not assertions of past fact. The evidence clearly indicates that Monks had personal knowledge about the bank robbery. According to White's testimony, Monks stated that *he* and Holt had just robbed the bank, which suggests, if Monks is not lying,[7] that Monks would indeed have personal knowledge as to who participated in the robbery. Furthermore, Monks related to White details of the robbery; that they had propped up the license plate of the getaway car and that a policeman had mistakenly pulled over the wrong car.

There is little probability of faulty recollection as Monks' statement to White occurred on the very day of the robbery and Monks' comments to Holt at the correctional center took place less than two weeks after the robbery. Finally, the circumstances surrounding the making of the statements do not suggest that Monks misrepresented Holt's role. There is no apparent reason why Monks would want to wrongfully implicate Holt when he told White about the robbery or when he talked to Holt at the correctional center. *See Dutton,* 400 U.S. at 89, 91 S.Ct. at 219–20. Furthermore, Monks' statements were against his own penal interest. *See id.*

█ Because Monks was unavailable and at least three of the four factors above strongly indicate that Monks' statement to White and his comments to Holt were reliable,[8] we hold that the admission of the statements as adoptive admissions did not violate the Confrontation Clause. The district court did not abuse its discretion in denying Holt a severance based on their admission into evidence.

c) Refusal to Allow Holt to Cross-Examine White about Recent Burglary (Issue No. 4)

Holt complains that the district court's refusal to let him cross-examine White as to White's possible involvement in a prior burglary involving Monks and a Mexican-American man named "Carlos" violated his right to effectively confront White. Because one of the factors behind the court's refusal may have been its desire to protect Monks, Holt urges this as another reason why the court should have granted his motion for severance.

Holt claims that he needed White's testimony about the prior burglary in order to 1) show a possible prejudice by White against Monks and 2) show the possibility that "Carlos," who fit a very general description of the bank robber and who was involved in prior criminal activity with White, was the one actually involved in the bank robbery.

█ With regard to Holt's first contention, any error in preventing cross-examination of White to show bias against Monks was harmless beyond a reasonable doubt. *See McKinney,* 707 F.2d at 384–85. First, Holt was allowed to cross-examine White to show that White worked as an informant both for pay and to avoid being charged with crimes himself. White admitted that he had been convicted for bank robbery and had a serious illicit drug habit. He admitted that at the time he turned Monks in he was worried about going to jail for the bank robbery. Therefore, any additional evidence of White's lack of credibility that might have come out upon cross-examination concerning the burglary would have been somewhat cumulative.

Moreover, the notion that White's involvement with Monks in an earlier burglary would give rise to a bias against Monks is purely speculative. White testified that he was still "good friends" with Monks on

---

7. Monks' honesty is not relevant to whether he had personal knowledge of the facts he relates. The possibility that he is lying is taken into account by the fourth factor.

8. It is not necessary that all four factors suggest reliability in order to satisfy the Confrontation Clause. *See Ordonez,* 737 F.2d at 804.

the day of the robbery. Third, even if Holt could have shown that White was seriously biased against Monks, such a bias would not give White any incentive to wrongfully accuse *Holt.*

Finally, because there is other strong evidence against Holt, including the positive eyewitness identifications, White's testimony is not crucial as to Holt's guilt. Considering all of the above factors together, we conclude that any error in denying cross-examination as to bias was harmless beyond a reasonable doubt.

■ Holt's second contention that White's testimony was needed to show that "Carlos" might have been the actual bank robber must also fail. The district court ruled the potential testimony irrelevant because the mere fact that White had associated with "Carlos" in some earlier criminal activity was not enough to implicate "Carlos" (and thereby exonerate Holt) in the absence of evidence showing that Carlos was involved in the robbery.[9] We cannot say that determination was an abuse of discretion.

Moreover, inquiry into this matter would be outside the scope of cross-examination. In fact, the district court only precluded Holt from extracting this testimony from White upon cross-examination (and from mentioning it in his opening statement), leaving open the possibility of Holt calling White on direct. But the record indicates that Holt never attempted to call White to testify on direct about this matter.

*Alleged Misrepresentation by Government in its Procurement of Arrest Warrant (Issue No. 5)*

Monks seeks dismissal of his case because he alleges that the government knew that White (who supplied the information presented by the government in its request for an arrest warrant) was a former convict and paid informant, and yet described him to the magistrate as a "reliable citizen." Because no evidence resulting from

his arrest would be used at trial, Monks asked the district court to exercise its supervisory powers and grant him a dismissal based upon the government's alleged "flagrant abuse of the judicial system."

■ The trial judge found that Agent Gosting's characterization of White as a reliable citizen, at least with regard to White's accusations about this particular robbery, was justified in light of the existence of corroborating evidence for his story. White had turned over the gun, clothing, and money wrapper sticks to Gosting. Therefore, even if the magistrate had been misled by Gosting's failure to inform him that White was a former convict and current police informant, because Gosting had good reason to believe White was telling the truth, we cannot say that his describing White as a "reliable citizen" amounts to misconduct posing a "serious threat to the integrity of the judicial process," the prerequisite to dismissal under a court's supervisory powers. *United States v. Everett,* 692 F.2d 596, 601 (9th Cir.1982) (quoting *United States v. Samango,* 607 F.2d 877, 885 (9th Cir.1979)), *cert. denied,* 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983). Under these circumstances, the district court certainly did not abuse its discretion, *United States v. Ramirez,* 710 F.2d 535, 541 (9th Cir.1983) (standard of review), in refusing to exercise a power to dismiss which we have termed an extreme sanction infrequently to be used. *United States v. Owen,* 580 F.2d 365, 367 (9th Cir.1978).

*Two Witnesses' Inadvertent References to Photo Line-up Pictures as Mugshots (Issue No. 6)*

■ Holt contends that the district court erred in refusing to grant a mistrial after two government witnesses referred to pictures they were shown in a photo lineup (which included a picture of Holt) as "mugshots." We will not reverse the district court's denial of a motion for mistrial unless there was an abuse of discretion.

**9.** Although the match between the descriptions of "Carlos" and the bank robber does add some relevance, the description is extremely general

(approximate height and weight, and Mexican-American male).

See *United States v. Kahan & Lessin Co.,* 695 F.2d 1122, 1125 (9th Cir.1982) (per curiam).

Although the "mugshot" references provided improper character evidence, we will uphold a district court's refusal to grant a mistrial where the prejudice resulting from introduction of the improper character evidence is "minimal," and the judge's offer to give a limiting instruction is rejected. *United States v. McCown,* 711 F.2d 1441, 1454 (9th Cir. 1983). First, the witnesses' references were incidental to the main thrust of their testimony and had been quickly glossed over. *See id.* at 1453. Their testimony was directed at their picking out Holt's picture in the photo lineup, not at the nature of the pictures. The reference was never discussed or referred to in front of the jury.

Second, the reference to "mugshots" is somewhat ambiguous in the absence of a more direct reference to prior criminal activity. *See United States v. Robinson,* 406 F.2d 64, 66 (7th Cir.), *cert. denied,* 395 U.S. 926, 89 S.Ct. 1783, 23 L.Ed.2d 243 (1969). Moreover, there was substantial evidence linking Holt to the crime, including two positive eyewitness identifications. *Cf. United States v. DeCarlo,* 446 F.2d 883, 884 (9th Cir.1971) (per curiam) (where evidence of guilt is overwhelming, motion for mistrial because of exposure to improper character evidence may properly be denied). In sum, the prejudice here was minimal.

The judge offered to give a limiting instruction but defense counsel declined because he felt that it would merely draw more attention to the reference. *Cf. McCown,* 711 F.2d at 1453. The references were apparently unintentional. *Cf. United States v. Snyder,* 505 F.2d 595, 600 (5th Cir.1974), *cert. denied,* 420 U.S. 993, 95 S.Ct. 1433, 43 L.Ed.2d 676 (1975). Taking all these factors into consideration, we hold that the district court did not abuse its discretion in denying a mistrial.

*Prosecutor's Reference in Opening Argument to Testimony that was Ultimately Excluded (Issue No. 7)*

Holt claims that the prosecutor's discussion in opening argument of Jan Schwartz' expected incriminating testimony requires a mistrial because her testimony was ultimately excluded by the judge. This contention is rejected.

The district judge cautioned the jury that statements by counsel are not evidence, and that some of the witnesses may not necessarily testify. Moreover, other than in the opening argument, the prosecutor never mentioned Schwartz' testimony again, at trial or in his closing argument. Finally, Schwartz' testimony would have constituted only a small part of the total evidence against Holt. As we stated in *United States v. Jones,* 592 F.2d 1038 (9th Cir.), *cert. denied,* 441 U.S. 951, 99 S.Ct. 2179, 60 L.Ed.2d 1056 (1979):

> A prosecutor's misstatement of the evidence does not automatically call for reversal. Instead, the court will reverse only if there is a serious possibility of prejudice to the defendant.
>
> In the instant case we cannot find a serious danger of prejudice to Jones. Both the court and the prosecutor warned the jury that the prosecutor's statements were not evidence; we have noted repeatedly that cautionary instructions can help neutralize the possible prejudicial effects of prosecutorial misstatements. Moreover, the prosecutor did not later rely on the misstatements. Finally, the Government's inability to produce evidence which it promised the jury would appear to harm the Government's case rather than the defense.

592 F.2d at 1043–44 (citations and footnotes omitted); *see also United States v. Vargas-Rios,* 607 F.2d 831, 838 (9th Cir.1979). The district court acted well within its discretion in denying the mistrial motion.

*The Tellers' Identifications of Holt (Issue No. 8)*

Holt contends that the photo lineups were unduly suggestive because 1) the tell-

ers were shown the bank surveillance photograph of the robber just prior to their identification, and 2) none of the other pictures in the lineup depicted persons similar in appearance to Holt or to the person shown in the bank surveillance photograph.

The government does not contest Holt's assertion that the other pictures used in the photo lineup were of persons very dissimilar to Holt or to the person shown in the bank picture. However, the record indicates that the tellers were not in any way directed towards Holt's picture. They were never told that the robbery suspect would in fact appear among the pictures but were merely asked to see if the person they believed robbed the bank could be in the pictures. After making their selection, they were not told if they had picked the "right one." *See United States v. Field,* 625 F.2d 862, 867 (9th Cir.1980) (in assessing suggestiveness of identification procedure, court should consider conduct of government agents tending to focus the witness's attention on the defendant).

No other witnesses were present at the identification sessions. *See id.* (another factor to consider in assessing suggestiveness of procedure). Thus, it cannot be said that Holt's picture would inevitably be selected whether or not he was in fact the robber, *cf. Foster v. California,* 394 U.S. 440, 443, 89 S.Ct. 1127, 1128–29, 22 L.Ed.2d 402 (1969), despite the fact that his picture was the only one that resembled the robber's description. *Cf. United States v. Barron,* 575 F.2d 752, 755 (9th Cir.1978) (not necessary to use all "very similar" individuals in a lineup).

Moreover, even if the lineups were unduly suggestive in failing to include pictures of other persons with physical characteristics similar to Holt's, the use of the identification does not violate due process

"if sufficient indicia of reliability are present." *United States v. Hanigan,* 681 F.2d 1127, 1133 (9th Cir.1982), *cert. denied,* 459 U.S. 1203, 103 S.Ct. 1189, 75 L.Ed.2d 435 (1983). Five factors to be considered in assessing reliability are:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id.* (quoting *Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 382–83, 34 L.Ed.2d 401 (1972)). After examining these factors, the court should weigh them against the corrupting effect of the suggestive identification procedure. *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977).

Hinkle and Romo were tellers who positively identified Holt both in court and at the photo lineup. Hinkle was only two feet away from the robber looking at his face for about three to four minutes. *Cf. Barron,* 575 F.2d at 755. Because the robber dealt primarily with Hinkle, she was necessarily paying full attention to him. Romo said she looked at the robber's face from the distance "between a customer and a teller" for about two minutes. Her attention would quite naturally be focused on the robber once she realized a robbery was taking place.

Although there were discrepancies in the tellers' descriptions of what the robber was wearing, this is not surprising as both Hinkle and Romo concentrated their attention on the robber's *face.*[10] All three tellers accurately described the robber's approximate age, nationality and hairstyle. Most importantly, Hinkle and Romo expressed a

---

**10.** Romo's testimony that she was *not sure* whether the robber had a mustache does not contradict Hinkle's testimony or the surveillance photographs indicating that the robber did have a mustache.

When confronted with the fact that she could not discern any pock marks on Holt's face at trial despite her testimony that the robber did

have them, Hinkle explained that her use of the term "pock marks" in describing the robber was meant to mean "pores," which she did discern on Holt's face at trial.

Romo's failure to see acne on Holt's chin at trial does not contradict her testimony that the robber had acne scars *five months earlier.*

high degree of certainty about their identifications both at the photo lineup and at trial. The photo lineup was performed only nine days after the robbery. *Cf. Barron,* 575 F.2d at 755 (two months does not defeat reliability where witness has never selected any other suspect).[11]

As noted earlier, the corrupting effect of the photo lineup's failure to include persons who looked similar to Holt was minimized by the fact that Gosting did nothing to direct the witnesses' attention to Holt's picture, did not indicate that the robbery suspect would be in any of the pictures, and conducted the identification out of the presence of other bank witnesses. We therefore conclude that the high degree of reliability suggested by our consideration above of the five factors outweighs the corrupting effect of the unbalanced photo display.

The fact that the bank surveillance photographs of the robber were shown to the tellers just prior to their photo lineup selection does not jeopardize their identifications because, as this court declared in *United States v. Stubblefield,* 621 F.2d 980, 983 (9th Cir.1980) (rejecting a similar claim),

> the recollection of an eyewitness is refreshed by the use of photographs of the crime itself. *See United States v. Ervin,* 436 F.2d 1331, 1333–34 (5th Cir. 1971). Little possibility of misidentification arises from the use of photographs depicting 'the likeness not of some possible suspect in the police files, but of the [persons] who actually committed the robbery.' *United States v. Evans,* 484 F.2d 1178, 1186 (2d Cir.1973).
>
> ... [A]ny resemblance between the persons in the photographs and the defendants not only was not impermissibly suggestive, but, in fact, was highly probative.

We conclude that the district court did not err in admitting the tellers' identifications.

Appellants' convictions are AFFIRMED.

---

11. Application of these five factors to teller Moss' identification yields similar conclusions with the exception of the degree of certainty of her identification. She could only narrow her choice down to three of the lineup pictures, and was only "pretty sure" of her identification at trial. However, to the extent that her identification may have thus been weak and ambiguous, the jury was made fully aware of her uncertainty and could, accordingly, discount her identification testimony. *See Manson v. Brathwaite,* 432 U.S. 98, 116, 97 S.Ct. 2243, 2253–54, 53 L.Ed.2d 140 (1977).