**Charles R. TOMLIN, Petitioner–Appellant,**

v.

**E. MYERS, Superintendent, Respondent–Appellee.**

No. 93–15247.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 3, 1993.

Decided July 28, 1994.

Gerson S. Horn, William S. Pitman, Law Offices of Gerson S. Horn, Beverly Hills, CA, for petitioner-appellant.

Janet Bangle, Deputy Atty. Gen., Sacramento, CA, for respondent-appellee.

Before: KOZINSKI and O'SCANNLAIN, Circuit Judges, and GEORGE, District Judge.*

Opinion by Judge KOZINSKI; Dissent by Judge GEORGE.

KOZINSKI, Circuit Judge.

In this state habeas appeal, we consider whether petitioner was represented by constitutionally deficient counsel.

## I

Sixteen years ago, Charles Tomlin was convicted of first degree murder for shooting

---

* The Honorable Lloyd D. George, Chief United States District Judge for the District of Nevada, sitting by designation.

Daniel Stewart during a drug deal gone bad. Stewart and his girlfriend, Laura Leticia Mendez, had arranged to sell nine pounds of marijuana through an intermediary, Charles Tillman. On the night the sale was to take place, everything seemed to go according to plan until Tillman directed Stewart and Mendez to an alley and got out of their truck, promising to return with the money. Seconds later, an armed man got into the truck and directed Stewart, who was at the wheel, to drive. The assailant soon fired his gun in Stewart's direction to get him to comply, which Stewart did, and then robbed them each of a few dollars and ordered Stewart to drive down an alley. When Stewart refused and appeared to reach for a weapon, the man shot Stewart in the head, grabbed the drugs and fled.

Mendez, who was unharmed, immediately provided a description of the assailant to police: a black man, approximately twenty-five years old; about five feet six to eight inches tall,[1] 150–160 .pounds, stocky and broad-shouldered; with a one and a half to two inch afro and, perhaps, a mustache; and wearing jeans and a Pendleton-type shirt. RT 222, 226.[2] She also pointed the finger— first at Tomlin's picture, and then directly at him, both in a live line-up and during trial. In fact, Mendez *was* the prosecution's case.[3]

## II

The live line-up, however, was illegal. Although Tomlin was represented, his lawyer— apparently through inadvertence on the part of the officers involved—was not notified and did not participate. The state, therefore, could not adduce any evidence of the line-up at his trial. *Gilbert v. California,* 388 U.S. 263, 273–74, 87 S.Ct. 1951, 1957, 18 L.Ed.2d 1178 (1967). And—if challenged—it would only have been entitled to present Mendez's in-court identification by demonstrating through "clear and convincing evidence that the in-court identification [wa]s based upon observations of the suspect other than the lineup identification." *United States v. Wade,* 388 U.S. 218, 240, 87 S.Ct. 1926, 1939, 18 L.Ed.2d 1149 (1967). Yet Tomlin's counsel never challenged Mendez's in-court identification and, in fact, himself elicited Mendez's testimony that she'd identified Tomlin in a live line-up.

The only issue before us is whether Tomlin's lawyer was constitutionally deficient. To show ineffective assistance of counsel, Tomlin must show that "counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and that "the deficient performance prejudiced the defense." *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). There is a "strong presumption that counsel's performance f[ell] within the 'wide range of professional assistance.'" *Kimmelman v. Morrison,* 477 U.S. 365, 381, 106 S.Ct. 2574, 2586, 91 L.Ed.2d 305 (1986) (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. at· 2065).

■ The district court held that counsel's performance was constitutionally deficient, but that Tomlin was not prejudiced because Mendez's in-court identification was derived from an independent source and would have been admissible under *Wade.*[4] A claim of ineffective assistance of counsel is a mixed question of law and fact, reviewed de novo. *Mannhalt v. Reed,* 847 F.2d 576, 579 (9th Cir.1988); *see Adams v. Peterson,* 968 F.2d 835, 843 (9th Cir.1992) (en banc).

## III

■ When faced with a client who has been identified in an illegal line-up, most

---

1. We note that at various points she testified that she'd described his height as being between five feet six to *seven* inches tall.

2. Although Mendez first told police the assailant was a hitchhiker she and Stewart had picked up, she testified at trial that her description was always of the actual assailant.

3. The prosecution stipulated, during the course of the state habeas proceedings, that Mendez's eyewitness testimony "was the sole evidence ty-

ing [Tomlin] as the perpetrator." Transcript of State Habeas Evidentiary Hearing ("Evidentiary Hearing") at 65.

4. The district court also rejected another claim raised by Tomlin, that counsel was ineffective for failing to investigate a rumor that a certain other individual committed the murder. As Tomlin has not pursued this claim on appeal, we do not address it.

defense attorneys would challenge the admission of any evidence related to it. After all, a defendant "arguably ... has 'everything to gain and nothing to lose' in filing a motion to suppress," *United States v. Molina*, 934 F.2d 1440, 1447 (9th Cir.1991), especially one involving an identification by the sole eyewitness to the crime.

Of course, "it is not professionally unreasonable to decide not to file a motion ... clearly lacking in merit." *Id.* The government, however, does not argue that the suppression motion here would have lacked merit, nor could it. Rather, it asserts that Tomlin's counsel had a tactical reason for failing to challenge the admission of this evidence, namely that the state would call Charles Tillman as a witness. *See* Transcript of Evidentiary Hearing at 250. Tillman had confessed to functioning as an intermediary during the events leading up to Stewart's death. It was he who led Stewart and Mendez to an alley and then disappeared, leaving Stewart and Mendez to the tender mercies of an armed assailant. It would seem a pretty safe bet he'd know the assailant's identity. And he had, according to the police, provided them with Tomlin's nickname, "Treetop," when asked who'd committed the murder.[5]

In light of this scenario, the state argues, it made sense for Tomlin's counsel to avoid challenging the line-up evidence—which might have led to suppression of Mendez's in-court identification—in order not to force the state to call Tillman as a witness. As the theory goes, defense counsel believed that the state would make a deal with Tillman for his testimony only if it lost Mendez's in-court identification,[6] and he thought Mendez's testimony would be easier to impeach than Tillman's.

In a case that so hinges on an eyewitness's testimony, however, it's difficult to assume that a reasonable tactical decision was made

not to challenge that testimony. We agree with the district court that the explanation presented by the State is simply too implausible to support a finding that counsel's performance was objectively reasonable. We also have serious doubts whether a competent attorney in this position would have predicted the state could make a better case with Tillman's testimony than with that of an innocent eyewitness. Tillman was, after all, the assailant's apparent accomplice, something certain to affect his credibility in the eyes of the jury; in fact, the trial court would surely have instructed the jury to use caution in weighing his testimony. *See* CALJIC 3.18 (5th ed. 1988). And, in order to secure a conviction using Tillman's testimony, the State would need corroborating evidence connecting Tomlin to the offense. Cal.Penal Code § 1111 (West 1985); *People v. Price*, 1 Cal.4th 324, 443–44, 3 Cal.Rptr.2d 106, 821 P.2d 610 (1991). If Mendez's live line-up and in-court identifications were kept out, the only such evidence the state would have had was Mendez's preline-up description of the assailant which, as discussed below, differs in material respects from Tomlin's appearance, and her identification of him in a photo line-up which, as also addressed below, she later testified was in various ways suggestive.

Moreover, the state's version of events does not coincide with counsel's testimony at the state habeas evidentiary hearing. According to counsel, he "was almost certain that [Tillman] was going to be offered a deal on the thing." Transcript of Evidentiary Hearing at 257. Not that this was contingent on whether Mendez would identify Tomlin—indeed, not that it was at all influenced by that fact. He thought it was going to happen. This does not reflect the type of deep strategic planning the state now attributes to Tomlin's counsel.

---

**5.** The police officer who interviewed Tillman after his arrest claimed Tillman had written the name "Treetop" on a piece of paper when asked to identify the assailant. He failed, however, to retain the paper. Transcript of Evidentiary Hearing at 285–87. At the evidentiary hearing, Tillman denied having done so and having ever pointed the finger at Tomlin. In fact, he claimed to have turned down a deal for a three year sentence if he would testify that Tomlin was the assailant. Instead, he went to trial and was convicted of murder and robbery. *Id.* at 270–78.

**6.** Tomlin's lawyer was apparently unaware of Tillman's refusal to testify against Tomlin. Instead, he thought Tillman had falsely identified Tomlin out of fear of the actual assailant, and might do so again at trial. *Id.* at 257.

Nor is there any other basis for finding counsel's actions to have been "the result of reasonable professional judgment." *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066. Some seven years later, at the evidentiary hearing, counsel seemed to explain that he didn't think the in-court identification would have been excluded because "there had been a previous photographic line-up that would not be a poisoned line-up and would have been admitted." Transcript of Evidentiary Hearing at 258. But he did not indicate that that was the basis on which he chose not to object. In fact, when asked if he would "have any reason for not objecting to [a live line-up in the absence of counsel]," he responded, "No. I certainly—if this was a fact, in retrospect, I certainly should have objected." *Id.* at 254. He called himself "derelict" for not making a motion on these grounds. *Id.* at 258–59. Nor could we deem such an approach reasonable, absent some indication the motion would have been lacking in merit. *Molina,* 934 F.2d at 1447. There is none. And without it, the failure to bring to the court's attention a major constitutional error in the prosecution's case is not the product of reasonable professional judgment.

We therefore agree with the district court that defense counsel's performance fell below an objective standard of reasonableness.

## IV

■ Before making a determination as to possible prejudice, we first take note of another troubling aspect of this case: Mendez didn't just identify Tomlin in court; she also testified she'd identified him previously in a live line-up. That evidence is without a doubt excludable under *Gilbert,* 388 U.S. at 273–74, 87 S.Ct. at 1957. The twist is, Mendez first revealed this line-up evidence in response to questioning by Tomlin's counsel on cross-examination ("And you later made an identification at a line-up in the Kern County Jail, is that correct? ... At that time the person you identified did not have an Afro, did he?" RT 216). The prosecution then immediately pounced on the issue on redirect, asking a number of questions about the illegal line-up, mostly designed to confirm Mendez had in fact selected Tomlin. Tearing wide open the narrow gap created by defense counsel's hapless inquiry, the prosecutor later questioned the officer who had conducted the line-up about how it was conducted, and introduced into evidence photographs taken at the time. Finally, in his closing statement he stressed to the jury that Mendez had identified Tomlin in a live line-up and that the line-up had been fair, and reminded the jury to look at the photographs of it.

Although we're concerned about defense counsel's decision to bring evidence of the illegal line-up before the jury, and his failure to challenge the extent of the prosecutor's subsequent exploitation of it, we're also quite troubled by the prosecutor's actions. This is certainly not the first case where a defense lawyer decided to elicit this kind of evidence on cross-examination of an eyewitness. *See, e.g., Wade,* 388 U.S. at 220, 87 S.Ct. at 1928–29; *United States v. Patton,* 721 F.2d 159, 162 (6th Cir.1983).[7] But the government's behavior here, in the face of its own initial culpability in conducting an illegal line-up, and doing nothing to later correct the error,[8] pushes hard on the limits of acceptable rebuttal, *cf. Clemons,* 408 F.2d at 1246: Defense counsel essentially asked Mendez a couple of questions about Tomlin's hairstyle at the time she identified him, RT at 216–17; the prosecutor used this opportunity to drive home to the jury that Mendez had identified

---

7. As the D.C. Circuit explained in *Clemons v. United States,* 408 F.2d 1230, 1237 (D.C.Cir. 1968), "If the judge regards only the in-court identification as admissible ... the defense may, as a matter of trial tactics, decide to bring out the pre-trial confrontation itself, hoping that it can thus detract from the weight the jury might otherwise accord the in-court identification."

8. After the prosecutor learned of the illegal line-up, he might have arranged for a second line-up, involving several panels not all of which included

Tomlin, with defense counsel present. Mendez's reactions might have indicated her first pick was in error or somehow influenced by the police. Also, knowing full well that the government was culpable in conducting the illegal line-up, it would certainly have been possible to limit the damage by seeking a pretrial ruling on whether Mendez's in-court identification could properly be introduced under *Wade. See Clemons,* 408 F.2d at 1237.

Tomlin in a live line-up, that the line-up had been fair and that Mendez had "no doubt" in her mind when she picked Tomlin, RT at 220.[9]

Tomlin, however, raised the issue of this illegal line-up testimony for the first time in a one paragraph supplemental letter a few days before argument in this court, submitting relevant pages from the trial transcript and directing us to our recent decision in *United States v. LaPierre*, 998 F.2d 1460 (9th Cir.1993), dealing with testimony regarding an illegal line-up. It's not clear whether Tomlin is arguing that this testimony should not have been admitted at all. But, whatever his argument is, we cannot address it now. 28 U.S.C. § 2254(b), (c).

Nor can we examine the issue in the context of Tomlin's ineffective assistance claim. All along, the basis for this claim has been that counsel failed to challenge the admission of evidence relating to the illegal line-up, not that he himself opened the door to such evidence at trial and thus opened the door for the state's massive follow-up. Because Tomlin did not raise this as part of his ineffective assistance claim below, we're unable to act on it.

## V

■ We look, then, to whether Mendez's in-court identification would have been admitted under *Wade*. Tomlin can show prejudice by showing a reasonable probability that, had the government been called to the task, it would have been unable to satisfy *Wade*'s requirements: "to establish by clear and convincing evidence that the in-court identification[ ] [was] based upon observations of the suspect other than the lineup identification." *Wade*, 388 U.S. at 240, 87 S.Ct. at 1939.

In making this determination, we are mindful of the Supreme Court's concerns regarding pretrial line-ups set forth in *Wade*.

There, the Court recognized "the dangers inherent in eyewitness identification and the suggestibility inherent in the context of the pretrial identification." *Id.* at 235, 87 S.Ct. at 1936. The Court requires counsel to be present at in-person line-ups with good reason: "A major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification." *Id.* at 228, 87 S.Ct. at 1933. Although a witness may later deny there was any suggestiveness—as Mendez did at trial here—that witness is "[un]likely to be schooled in the detection of suggestive influences." *Id.* at 230, 87 S.Ct. at 1934. The same goes for the defendant. *Id.* at 231, 87 S.Ct. at 1934. And, the reality of the situation is, once a witness has picked out a suspect—whether influenced by the police in doing so or not—she will not easily go back on her word. *Id.* at 229, 87 S.Ct. at 1933.[10]

In light of these concerns, we must assess the likelihood that Mendez's in-court identification was free from the taint of the illegal line-up by considering such factors as

> the prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any pre-lineup description and the defendant's actual description, any identification prior to lineup of another person, the identification by picture of the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the lineup identification.

*Id.* at 241, 87 S.Ct. at 1940. In addition, we look to such particulars as the lighting conditions under which Mendez viewed the assailant, her level of distraction, and any hesitation on her part in making other pretrial identifications. *United States v. Crews*, 445

---

**9.** Tomlin's counsel asked four questions pertaining to the line-up; the prosecutor asked twenty.

**10.** That there were pictures of the line-up mitigates the prejudice, but does not remove it. Although the pictures would show the other individuals who participated in the line-up, they ob-

viously cannot disclose anything that happened in the witness room. *See LaPierre*, 998 F.2d at 1464 (videotape of line-up where counsel not present did not satisfy *Wade*'s concerns because it did not record anything that occurred in witness room).

U.S. 463, 473 n. 18, 100 S.Ct. 1244, 1251 n. 18, 63 L.Ed.2d 537 (1980).

Applying these factors in *Crews*, the Court held that the trial court's finding of an independent source for the victim's courtroom identification was "ampl[y] support[ed]" where the victim had viewed her assailant at close range for five to ten minutes under "excellent lighting conditions and with no distractions," had provided a description which "closely matched" the defendant, had failed to identify anyone else and had twice identified the defendant, and only a week had passed between the crime and her first identification of him. *Id.* at 473, 100 S.Ct. at 1250–51. The case, however, did not involve a possibly suggestive pretrial line-up, but merely an illegal arrest where a "court-ordered," *id.* at 467, 100 S.Ct. at 1247–48, and presumably legal line-up was conducted.

After analyzing the *Wade* factors, the district court here held that Mendez's in-court identification was derived from an independent source.[11] In doing so, it relied on several "significant events" that took place before the illegal line-up: Mendez's observations of the assailant at the time of the crime; her subsequent description of Tomlin to the police; and her selection of his picture in a high school yearbook and in a photographic line-up. One problem with its analysis is that one of these "significant events" didn't occur: It was Tillman's picture, not Tomlin's, that Mendez selected from the yearbook. We are also left to wonder whether the district court took into account the government's burden of proof in seeking to show that the in-court identification was constitutional—which would have been by proof of "clear and convincing" evidence. *Wade*, 388 U.S. at 240, 87 S.Ct. at 1939. After considering the *Wade* factors, the court merely stated it was "reasonable to conclude that Mendez would have

been allowed to identify petitioner in court." ER 20.

■ Reviewing its findings de novo,[12] we part company with the district court's determination that there was an "independent source" for Mendez's in-court identification. As the district court recognized, Mendez had an opportunity to observe the assailant for four to five minutes. And, as the state points out, Mendez testified at trial that she had a good chance to look at the assailant's face. RT 208. The circumstances under which she viewed him, however, limit to some extent the reliability of any observations Mendez made. Not only did the assailant suddenly barge into the truck while she and Stewart were stopped in a dark alley, but he also sat *next* to her. To observe him, she would have had to turn her head, and even then it would have been difficult to see him full-face. When one of the first things the assailant did was to fire his gun at close range within the enclosed space of the truck cab, it's doubtful Mendez would then have spent much time turned towards him, calmly noting his facial features and other aspects of his appearance. The situation here is thus very different from that in *Crews*, where the victim had viewed her assailant frontally for five to ten minutes under the bright lights of a public restroom. *Crews*, 445 U.S. at 473 n. 18, 100 S.Ct. at 1251 n. 18.

We also don't have here a suspect who "closely matched the description given by the victim immediately after the robbery." *Id.* Contrary to what the district court found, Mendez did not "immediately identif[y] the petitioner to a police officer." ER 20. She identified a black man, twenty-five years in age, five feet six to eight inches tall, heavy build, with a possible mustache and an inch and a half to two-inch afro, wearing blue jeans and a Pendleton-type shirt. Tomlin, by contrast, although a black man who was then

---

**11.** Although we are referring to the magistrate's findings and recommendations, they were adopted in full by the district court.

**12.** Whether Mendez's identification was derived from an independent source is a mixed question of law and fact, as " 'the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the [relevant] ... [constitutional] standard, or to

put it another way, whether the rule of law as applied to the established facts is or is not violated.' " *Norris v. Risley*, 878 F.2d 1178, 1181 (9th Cir.1989) (quoting *United States v. McConney*, 728 F.2d 1195, 1200 (9th Cir.1984) (en banc)) (alteration in original). As the mixed question here involves constitutional rights, de novo review is particularly appropriate. *Id.*

twenty-six years old, is six-feet tall, and at the time was thin and wore a shoulder-length, straightened permanent hair style. RT 345–46, 348–49; *see* Transcript of Evidentiary Hearing at 14. Tomlin and other witnesses testified that he did not own a Pendleton-type shirt. RT 348. Considering the heavy clothing worn by the assailant and the fact that Mendez based her description of his height on her estimation while she sat next to him, RT 208, we might discount the difference between Mendez's description and Tomlin's actual height and build.[13] However, there's no discounting the discrepancy between Tomlin's hair style and Mendez's description.[14] While a physical description need not be perfect to be reliable, *see United States v. Monks,* 774 F.2d 945, 956–57 (9th Cir.1985), the discrepancies here—never mentioned by the district court—cast additional doubt on the reliability of Mendez's description. Their shadow thus extends to her later in-court identification.

We must also consider any pre-lineup picture identifications. Mendez chose Tomlin's picture from a photographic line-up. At the time of trial, she testified that there had been no undue influence by the detective involved when she made this identification. When testifying during the state evidentiary hearing on Tomlin's habeas petition, however, Mendez indicated that, at the time of this line-up, she was most likely under the influence of tranquilizers, and that when she was shown Tomlin's photograph, the detectives exchanged glances that led her to choose it. She also said that she'd expressed uncertainty at the time, and told the officers she needed to see the suspect in person as it was "hard to tell from a photo." Transcript of Evidentiary Hearing at 116–120.

The state court concluded her testimony at the evidentiary hearing was not credible, and we accord this determination a presumption of correctness. 28 U.S.C. § 2254(d); *Marshall v. Lonberger,* 459 U.S. 422, 434, 103 S.Ct. 843, 850–51, 74 L.Ed.2d 646 (1983). To reject this finding, we must conclude that it "lack[s] even 'fair support' in the record." *Id.* at 432, 103 S.Ct. at 850. The record from the evidentiary hearing, however, indicates Mendez waffled considerably between recanting her trial testimony and confirming it. The number of contradictions and uncertainties we find in reading through it leads us to find "fair support" for the state court's determination that Mendez's evidentiary hearing testimony that the photographic line-up was suggestive was not credible.[15] The result of that line-up, therefore, remains reliable.[16] And it cuts in the government's favor that there was only a short time that passed between the crime and this first identification of Tomlin. *Crews,* 445 U.S. at 473 n. 18, 100 S.Ct. at 1251 n. 18.

13. Her description of his weight was fairly accurate, but this seems to cut the other way considering the height discrepancy. A five foot seven individual who weighs 150 pounds looks significantly different from a six foot individual at that weight.

14. The state argues that we shouldn't be influenced by this discrepancy, because the arresting officer testified at the evidentiary hearing that, at the time of Tomlin's arrest several days after the crime, he had his hair combed in such a way that it could look like a short natural in the dark. Perhaps it's possible to comb a shoulder-length straightened style so that it looks like a short afro but, considering these are vastly different hairstyles, we cannot entirely discount the significance of this discrepancy.

15. For example, Mendez at one point testified that she'd been truthful and had no doubt at the time she'd made trial and pretrial identifications of Tomlin, but later stated she was unsure at the time she identified him. Transcript of Evidentia-ry Hearing at 142, 228. Although she first stated that during the photographic line-up the detectives "exchanged glances" when she reached Tomlin's photo, on cross-examination she testified that when she was going through the line-up, she stopped at Tomlin's photograph because, at the time, it looked like the assailant. *Id.* at 117, 131.

16. In determining whether Tomlin was prejudiced by his counsel's failure to challenge Mendez's in-court identification, we note that had he demanded an evidentiary hearing on the independent source issue, Mendez's testimony would have been key. As Tomlin now argues, we don't know what might have come out at that time concerning the conduct of the photo line-up; perhaps details would have been elicited along the lines of some of her statements at the evidentiary hearing that would have led the trial judge to exclude the photo line-up evidence. The burden, after all, was on the state to establish an independent source by clear and convincing proof. *Wade,* 388 U.S. at 240, 87 S.Ct. at 1939.

Of course, it is also significant that Mendez never identified another individual as the assailant and, as had the victim in *Crews*, did identify Tomlin before trial. *Wade*, 388 U.S. at 241, 87 S.Ct. at 1939–40. But the police gave Mendez only one other chance to identify her assailant, and that was the illegal line-up. And we cannot consider the live line-up to bolster her in-court identification: [17] "[T]he accurate pretrial identifications assume significance only to the extent that they indicate that the witness' ability to identify respondent antedated any police misconduct...." *Crews*, 445 U.S. at 473 n. 18, 100 S.Ct. at 1251 n. 18. As noted, the prosecution did nothing to mitigate the effects of its misconduct, *see* n. 8 *supra*, which, in turn, would have helped carry its heavy burden of showing an independent source.

This is a close case. Before an illegal line-up was ever conducted, and soon after the shooting, Mendez identified Tomlin in a photographic line-up. Yet, although she did observe the assailant for a few minutes at the time of the murder, various constraints necessarily limited her observations. And immediately afterward, she gave the police a description of the assailant that differed significantly from Tomlin's actual appearance. Considering all of the evidence, we cannot find, as *Strickland* requires, "a reasonable probability" that, had Tomlin's counsel objected to the in-court identification, the government would have been able to show— clearly and convincingly—that Mendez's ability to identify Tomlin was not influenced by the illegal line-up. Tomlin thus was prejudiced by his lawyer's failure to challenge Mendez's in-court identification. And, there is a serious risk that Tomlin was, in fact, wrongly identified as the assailant. His petition must be granted.

**REVERSED.**

GEORGE, District Judge, dissenting:

## I.

Some fifteen years ago, petitioner's trial counsel, an attorney with approximately thirty years of active, continual, criminal experi-ence, and who by that point had been involved in approximately 175 other murder cases, became counsel in this one. Petitioner, Charles Ray Tomlin, had been charged with the shooting death of Daniel Stewart during a hold-up in connection with a drug deal. Two other individuals were acquainted with some of the events that took place that evening. One, Laura Leticia Mendez, was sitting in the pickup truck between the assailant and Stewart when the assailant shot Stewart in the head. The other, Charles Tillman, had acted as an intermediary during the drug transaction, and had exited the truck moments before the assailant's arrival. Tillman had been arrested, and was later convicted of murder and robbery for his participation in the crime.

Tomlin's trial counsel knew that the prosecution intended to use Mendez as a witness against Tomlin at trial. He had listened to Mendez testify in detail at the preliminary hearing about Tillman's involvement in the incident, and had cross-examined her at length regarding her identifications of his client. Counsel believed that Mendez was testifying truthfully, but that she was mistaken as to the identification.

Counsel also knew that the prosecution could, if necessary, offer a deal to Tillman in exchange for his testimony against Tomlin. Mendez had identified Tillman as the intermediary, and Tillman had identified Tomlin as the assailant to the police. Counsel was further concerned that because Tomlin was to be tried before Tillman, the prosecution would be in a position to offer Tillman a deal at any point.

In addition, Tomlin had an alibi. His wife and mother-in-law would testify that he was at home that night, with a neighbor recalling that Tomlin's car remained parked at home at the time of the murder. Accordingly, counsel developed a defense based on mistaken identification and alibi, and pursued that strategy at trial.

When the issue of the illegal line-up arose, counsel would have been faced with a decision. Because the live line-up was conducted

---

**17.** Again, although Mendez testified that the line-up was not suggestive, her testimony is necessar-ily somewhat unreliable on this point. *See Wade*, 388 U.S. at 230, 87 S.Ct. at 1933–34.

outside of his presence, Mendez's in-court identification of Tomlin would not be admissible unless the prosecution could show, by clear and convincing evidence, that the identification was based on a source independent of the line-up. Counsel could move to suppress Mendez's identification, which motion, if successful, increased the likelihood that the prosecution would strike a deal for Tillman's more damaging testimony. What's more, counsel believed that the Mendez's in-court identification was based on an independent source, and that the motion would not be successful. Under the circumstances, trial counsel's judgment could very reasonably have been not to try to suppress Mendez's in-court identification, at the risk of Tillman testifying for the prosecution. After a full evidentiary hearing, the state court found that it was in Tomlin's best interests to forego a challenge to Mendez's in-court identification.[1]

The majority has taken a somewhat different view of the facts and, based on that, has determined that counsel's performance was not objectively reasonable. I cannot concur.

## II.

The sixth amendment guarantees the right to effective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 2063–64, 80 L.Ed.2d 674 (1984). In order to prevail on the ineffective assistance of counsel claim, Tomlin must show that: (1) the assistance provided by his counsel fell below an objective standard of reasonable-

ness, and (2) but for counsel's errors a reasonable probability exists that the result of the proceeding would have been different. *Id.* at 687, 104 S.Ct. at 2064. A district court's dismissal of a claim of ineffective assistance of counsel is reviewed de novo, but the state court's factual findings are given a presumption of correctness. *Sumner v. Mata,* 455 U.S. 591, 591–92, 102 S.Ct. 1303, 1303–04, 71 L.Ed.2d 480 (1982) (per curiam); *United States v. Horodner,* 993 F.2d 191; 194 (9th Cir.1993) 28 U.S.C. 2254(d).

Counsel must be allowed wide latitude with regard to making tactical decisions. *Strickland,* 466 U.S. at 689–90, 104 S.Ct. at 2065–66; *Campbell v. Kincheloe,* 829 F.2d 1453, 1464 (9th Cir.1987), *cert. denied,* 488 U.S. 948, 109 S.Ct. 380, 102 L.Ed.2d 369 (1988); *United States v. Murray,* 751 F.2d 1528, 1535 (9th Cir.), *cert. denied,* 474 U.S. 979, 106 S.Ct. 381, 88 L.Ed.2d 335 (1985) (tactical decisions essentially unreviewable). While we may disagree with counsel's tactics, such tactics do not fall outside the wide ambit of reasonably representation merely because their wisdom is subject to second-guessing. *See Morris v. California,* 966 F.2d 448, 456 (9th Cir.) (defendant failed to overcome presumption that counsel's failure to object to certain character evidence constituted sound trial strategy), *cert. denied,* —— U.S. ——, 113 S.Ct. 96, 121 L.Ed.2d 57 (1992); *Hughes v. Borg,* 898 F.2d 695, 703 (9th Cir.1990) (counsel's conduct was not objectively unreasonable where counsel took into consider-

---

1. The state court reasoned:

   Had the in-court identification of defendant by Mendez been excluded, the prosecution would have been forced to go to the only other identification source available, namely, Charles Tillman. The People would have been forced to offer Tillman some deal in exchange for his testimony and at worst, offered complete immunity to him in order to obtain his testimony against defendant Tomlin.

   Tillman could have identified defendant. He could have testified that Tomlin was the person that he, Tillman, had contacted to make the marijuana buy; that defendant had agreed to meet the victim for the purported purchase; that defendant had confided that he had no intention of buying the contraband, but instead, intended to rip-off (rob) the victim. Tillman's testimony would have been much stronger and damaging evidence against defen-

dant than was the identification testimony of Leticia Mendez. Tillman knew Tomlin personally. There would have been no issue of any mistaken identification by him.

Counsel's choice to proceed through trial without trying to exclude Mendez's in-court identification was wide in light of her lack of any acquaintance with defendant Tomlin. Because of this, defense counsel could explore discrepancies in Mendez' description of the killer's height, his build and hair style as compared to defendant Tomlin, such as they were.

The prospects of a successful defense, coupling defendant Tomlin's alibi testimony with impeachment of Mendez' identification was much more promising than it would have been against testimony by Charles Tillman as a prosecution witness.

Opinion and Order, No. 2926 at 8–10 (October 23, 1986).

ation all circumstances); *United States v. Mayo,* 646 F.2d 369, 375 (9th Cir.) (a difference of opinion as to appropriate trial tactics does not rise to the level of denial of effective assistance of counsel), *cert. denied sub nom., Dondich v. United States,* 454 U.S. 1127, 102 S.Ct. 979, 71 L.Ed.2d 115 (1981).

Our precedent teaches that a claim of incompetence of counsel cannot be based upon counsel's choice not to pursue a constitutional challenge if there is a possibility that, by doing so, evidence harmful to his client may be admitted. In *Nelson v. California,* 346 F.2d 73 (9th Cir.), *cert. denied,* 382 U.S. 964, 86 S.Ct. 452, 15 L.Ed.2d 367 (1965), the Ninth Circuit held that appellant had received satisfactory legal representation despite trial counsel's failure to challenge the constitutionality of an incriminating search of appellant's apartment. The court determined that counsel's decision to object, on the ground of immateriality, to an inquiry which was relevant to the question of probable cause, did not constitute ineffective assistance of counsel because, if probable cause had been made an issue, additional testimony, possibly harmful to appellant, might have been admitted. *Id.* at 80.

In *Morris,* 966 F.2d at 456, the Ninth Circuit held that counsel's decision not to call a witness on petitioner's behalf was within the wide range of professional representation because had the witness been called, the prosecution "could possibly" have linked the witness and the petitioner to prior involvement with drugs. The court also held that petitioner had failed to overcome the presumption of sound trial strategy when counsel decided not to object to the prosecutor's questions regarding petitioner's prior drug use. Assuming that petitioner's testimony was inadmissible, the court nonetheless concluded that an effective advocate could reasonably have decided not to object because petitioner's admission to prior drug use could have bolstered her credibility with the jury as to her other testimony. However, "[e]ven if that turned out not to be the case, a tactical decision not to object would have been reasonable at the time it was made." *See Williams v. Chrans,* 894 F.2d 928, 935 (7th Cir.1990) (failure to challenge reliability of a witness's identification proper since such a challenge could have called attention to a more detrimental previous identification).

In this case, the majority pays no deference whatsoever to counsel's tactical decisions when analyzing whether they were objectively seasonable. First, the majority raises questions about counsel's assessment of the possible impact of Tillman's testimony against Tomlin.[2] According to the majority, the fact that Tillman was Tomlin's accomplice would adversely affect his credibility before a jury. That argument overlooks Tomlin's defense of mistaken identity and alibi, however. As the state court recognized, no more convincing identification could be made of Tomlin than by his accomplice who personally knew him, who had confessed to functioning as an intermediary during the events leading up to Stewart's death, who had led Stewart and Mendez to the assailant, and who had identified Tomlin to police. Furthermore, no greater damage could be done to Tomlin's alibi than to have Tillman detail Tomlin's participation in the planning and execution of the crime.

---

2. The majority points out that, during the evidentiary hearing, Tillman denied having identified Tomlin. Officer Vincent testified, to the contrary, that Tillman had identified Tomlin by his street name, Treetop. I am somewhat surprised that the majority would raise the dispute between the testimony of Tillman and Officer Vincent in light of the state court's express adoption of Vincent's version. *See* Opinion and Order No. 2926 at 3 (October 23, 1986). That finding must be given deference if fairly supported. 28 U.S.C. 2254(d). One need only look at the substance of Tillman's evidentiary hearing testimony to understand why the state court rejected it. At the beginning of that testimony, Tillman asserted the fifth amendment privilege, to no avail. Evidentiary Hearing Transcript at 261. What followed was a failure of memory and denial by Tillman regarding virtually all of the events related to the crime for which he was convicted. Tillman did not recollect telling Vincent that he set up the drug deal between Stewart and "Treetop." He did not recollect writing "Treetop" on the paper. He did not remember telling the police that he had been involved in arranging a drug deal at all. He denied meeting Mendez and Stewart and directing them to the alley where the drug deal was to happen. He denied that he arranged for another person to meet them. He denied having had any contact with Stewart or Mendez. He denied having known Tomlin or having heard of him at all. *Id.* at 278–79.

I find it significant that no suggestion has been made that counsel failed to meaningfully test the substance of Mendez's testimony before deciding to forego a challenge to her in-court identification of Tomlin. Even "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91, 104 S.Ct. at 2066. Here, trial counsel was involved in the preliminary hearing. He heard Mendez's detailed account and cross-examined her extensively. His assessment that Mendez was truthful but mistaken in her identification of Tomlin, and his choice of her as a witness, as opposed to Tillman, was therefore an informed one.

The majority next asserts that if Tillman's testimony were used to secure Tomlin's conviction, the State, under California law, would need corroborating evidence connecting Tomlin to the offense. That position unjustifiably assumes that the authorities would have gained no additional corroborating evidence as a result of Tillman's cooperation. What's more, the majority so much as acknowledges that even absent Mendez's in-court identification, her description of the assailant to police and her identification of him in the photo line-up themselves provide the corroboration necessary for admissibility of Tillman's testimony.[3]

Finally, the majority points out that during the state evidentiary hearing some seven years later, counsel stated that "in retrospect" he should have objected to the live line-up. The majority further seizes, as did the district court, upon counsel's admission that he must have been "derelict" for not making a motion on those grounds. But it completely passes over the reason why counsel professed such dereliction: by not moving to suppress the line-up he had failed to preserve the issue for appeal. Evidentiary Hearing Transcript at 259. The question of whether counsel was deficient for failing to preserve the line-up issue for appeal, however, is a new ground for relief not before this panel. And the analysis of that question raises the same substantive line-up issues that we have already declined to consider. Counsel's singular and retrospective concern was that he failed to preserve an appellate issue. He never once suggested that his decision to not object to the identification, at the time it was made, was not in Tomlin's best interests. Under those circumstances, I differ with the majority's conclusion that counsel's testimony was not consistent with an objectively reasonable strategy.

In sum, counsel's selection of mistaken identity and alibi as defenses was consistent with his decision not to risk the introduction of Tillman's testimony if Mendez's identification were suppressed. I cannot say that such a decision is professionally unsound. *See Henry v. Mississippi*, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965) (defendant could not successfully maintain an ineffective assistance claim on the ground that counsel had eschewed one of several reasonably and mutually exclusive litigation alternatives in favor of another); *Martin v. McCotter*, 796 F.2d 813 (5th Cir.1986) (where defense strategy was not one of suggestiveness of photographic line-up, but rather alibi, counsel's admission that photographic line-up was not suggestive, was not ineffective assistance), *cert. denied*, 479 U.S. 1057, 107 S.Ct. 935, 93 L.Ed.2d 985 (1987).

There is another reason that deference should be given to counsel in this case. In the evidentiary hearing, trial counsel was asked how he would have proceeded in terms of the entire identification issue had the in-person line-up been suppressed, but not the photographic lineup. He stated:

> Well, it is my feeling that it would not have been suppressed by the judge because there had been a previous photographic

---

**3.** The majority challenges the corroboration by pointing out (1) the alleged differences in Mendez's description and Tomlin's appearance, and (2) Mendez's evidentiary hearing testimony in which she testified that the photo line-up was suggestive. The description/appearance discrepancies, to the extent any exist, go to weight, and not admissibility, of the corroborating evidence. As to Mendez's evidentiary hearing testimony, the majority accepted the state court's credibility determination rejecting it. In my view, we should stay true to that rejection, and forthrightly disregard Mendez's recantations.

line-up that would not be a poisoned line-up and would have been admitted.

Evidentiary Hearing Transcript at 258. Regarding why he did not make a motion to suppress only the photographic line-up, counsel testified:

> Frankly, I cannot tell you why I would not have attempted. It may well be that I felt that it was not legally suppressible at the time. Now I could certainly be in error on the law, but it was not—this to clarify things, at this time I had perhaps tried somewhere in the vicinity of maybe—or I had been involved somewhere in the vicinity of 175 homicide cases. I had been in practice, active practice day after day in the criminal courts for some 30 odd years. I felt that I had a fair knowledge of the law of evidence, criminal trials at that time, but I can't—all I can say is that if I didn't do it, it was because I didn't think that it would have been effective.

*Id.* at 252–53.

Thus, while counsel, after eight years, might not have remembered exactly why he didn't object, his best explanation was that it would not have been effective in light of the existence of the previous untainted photographic line-up.[4] Indeed, we need not determine the actual explanation for counsel's failure to object, so long as his actions fall within the range of reasonable representation. *Morris,* 966 F.2d at 456.

In *United States v. Smith,* 551 F.2d 348 (D.C.Cir.1976), the defense attorneys were apprised that the government had obtained pretrial photographic identifications from the witnesses who were expected to identify defendants in court. They declined to object based on their judgment regarding the constitutionality of the photographic identifications even though the weight and credibility of the evidence might be subject to dispute. The court of appeals held that counsel's failure to object did not constitute ineffective assistance, remarking:

Counsel's failure to move to suppress was thus the product of deliberate and informed decision not oversight or inadvertence. As an appellate court, remote from the trial arena, we are reluctant to second-guess the considered judgments of experienced trial counsel. Particularly is this so when such judgments appear sound, even after evaluation by a tribunal enjoying the benefits of hindsight and time for reflection. Here, nothing in the record convinces us that the pretrial photo identification violated the due process standard elaborated by the Supreme Court in *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). Under the circumstances, we perceive no reason why conscientious advocacy should require the futile formality of a suppression hearing.

*Id.* at 353–54 (footnotes omitted).

In this case, there is nothing in the record that may be used to suggest that the photographic line-up given to Mendez was tainted in any way. I do not see how we can say, in view of the photographic identification, that counsel's judgment was faulty for anticipating that the trial court would find in it an independent basis for the in-court identification; nor how, assuming that such a question is at best a "close case," Tomlin has overcome the strong presumption in favor of counsel's effective performance.

### III.

To show prejudice, Tomlin must demonstrate that, but for counsel's errors, a reasonable probability exists that the result of the proceeding would have been different. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. Here, that determination rests upon whether the in-court identification was tainted by the illegal line-up. If clear and convincing evidence shows that the courtroom identification rests on an independent basis, then the courtroom identification would be admissible

---

4. Counsel had substantial basis for determining before the trial that the photographic line-up was untainted. During the preliminary hearing, at which counsel was present, Mendez testified that the photographic line-up was not suggestive. Preliminary Hearing Transcript at 4–5. Counsel cross-examined her on the conduct of the photo- graphic line-up and the makeup of the photographic array. *Id.* at 48–49. Counsel also examined Detective Vincent, who had presented the photographic line-up to Mendez. *Id.* at 82–84. Counsel himself moved to have the photographs marked for identification, and used them in questioning Vincent. *Id.* at 83.

and the results of the proceedings no different. Again, it is Tomlin's burden to show that, had a *Wade* hearing been conducted, the court would have excluded Mendez's testimony. There is no license here to make assumptions in favor of a finding of prejudice.

As the majority admits, Mendez identified Tomlin in a legally valid photographic line-up conducted before the illegal in-person line-up. That, coupled with Mendez's opportunity to view the assailant, should be sufficient for finding an independent basis for Mendez's in-court identification. *See Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968) (convictions in which an eye-witness identification follows a previously held pretrial photographic identification will not be set aside unless the "photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."); *United States ex rel. Burke v. Illinois*, 465 F.2d 268, 270 (7th Cir.1972) (in independent basis determination, great weight placed on non-suggestive photographic line-up).

The object of a *Wade* hearing is to determine whether the in-court identification had an independent source. *United States v. Wade*, 388 U.S. 218, 242, 87 S.Ct. 1926, 1940, 18 L.Ed.2d 1149 (1967). The photo line-up singularly provides the "means sufficiently distinguishable to be purged of the primary taint [of the illegal lineup]." *Id.* at 241, 87 S.Ct. at 1939. The photographic line-up occurred before the illegal line-up. It is completely distinguishable from the description that Mendez offered to police, and remains reliable. It seems somewhat inconsistent that the photographic line-up could not be

the basis for setting aside Tomlin's conviction under *Simmons*, while, at the same time, it could fail to form an independent basis for the in-court identification under *Wade*.

The district court below found that Tomlin had not been prejudiced. I believe that, in its disagreement with that conclusion, the majority draws some unwarranted conclusions, without which, affirmance on the prejudice aspect would be appropriate.

The majority points to the district court's mistaken conclusion that Mendez identified Tomlin from the yearbook as evidence that the court may not have taken into account the government's burden of proof in seeking to show that the in-court identification was constitutional. In fact, since Mendez's yearbook identification of Tomlin never occurred, and therefore would not have been considered in a *Wade* hearing, I am at a loss to see how its "shadow" could extend to the in-court identification. In the end, our focus must be on what could have made a difference at a *Wade* hearing, not what would not have made a difference.[5]

Similarly, the majority hypothesizes that a *Wade* hearing might have elicited something suggestive about the photographic line-up. Such speculation is contrary to *Strickland's* requirement that Tomlin show actual prejudice, contrary to the majority's acceptance of the state court's credibility determination, and contrary to the record as we have it.

In determining whether an in-court identification has an independent source, a court should consider (1) the opportunity of the witness to view the suspect at the time of the crime, (2) the existence of any discrepancy between a pre-line-up description and the

5. The majority brings up another point that, as it ends up, doesn't matter much. It raises the issue of the introduction of testimony regarding the illegal line-up, then drops it because it is not one of Tomlin's claims. But not before an *obiter dictum* proclamation of a prosecutor's obligation to confine his response when the illegal line-up testimony is elicited in the first instance by the defense. In this case, the majority announces that the prosecutor went too far by asking questions about Mendez's line-up identification of Tomlin and the conduct of the line-up, and by arguing to the jury that the line-up was fair. However, after the line-up issue was raised, even

in a minor way, the prosecutor was compelled to capitalize upon it. The jury could have perceived a line-up identification as a crucial piece of evidence. Yet the prosecutor had not raised the issue on direct examination, and could not explain to the jury the reason that he hadn't. Instead, at that point, the prosecutor had to completely dispel any implication that he had not been forthcoming by making the live line-up identification part of his case. Once pretrial evidence is placed before the jury by the defense on cross-examination, the *per se* exclusionary rule is no longer applicable. *United States v. Patton*, 721 F.2d 159, 162 n. 4 (6th Cir.1983).

defendant's actual appearance, (3) any identification prior to the line-up of another person, (4) the identification by picture of defendant prior to the line-up, (5) the failure to identify the defendant on a prior occasion, and (6) the lapse of time between the crime and the confrontation. *Wade,* 388 U.S. at 242, 87 S.Ct. at 1940; *see also Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 382–83, 34 L.Ed.2d 401 (1972) (due process analysis including as a factor the level of certainty demonstrated by the witness).

The majority concedes that the reliability of the photographic identification remains unequivocal, that only a short time passed between the crime and the first identification of Tomlin, and that Mendez never identified another individual as the assailant.[6] As for the accuracy of the description, the majority correctly discounts the difference between Mendez's description and Tomlin's actual height and build. *See United States v. Smith,* 473 F.2d 1148, 1149 (D.C.Cir.1972) (description and height difference of 4–5 inches understandable where victim viewed defendant while he was sitting in the car). What is left is an appraisal of Mendez's opportunity to view the assailant, and the alleged discrepancy between Tomlin's hair style and Mendez's description to police.

I am very troubled by the majority's treatment of Mendez's opportunity to view the assailant. It again draws unwarranted conclusions and overlooks uncontroverted evidence in the record that Mendez looked directly at the assailant's face at a distance of one foot. The majority points out that Mendez had an opportunity to observe the assailant for four to five minutes and that Mendez testified at trial that she had a good chance to look at the assailant's face. Despite that, the majority second-guesses the extent to which Mendez may have seen what she was looking at. It remarks that the assailant sat "next" to Mendez in the pickup truck, brandished a gun and fired it once, and that Mendez would have to turn her head to see him. Under such circumstances, the majority states, "it's doubtful Mendez would then have spent much time turned towards him, calmly noting his facial features and other aspects of his appearance." For all its supposition, that statement cannot obscure the law and facts that should be guiding our analysis.

Mendez had an extraordinary opportunity to view her assailant, and took advantage of it. The opinion neglects to point out that Mendez first saw the assailant outside the passenger side door next to her even before she knew he had a gun and before a shot was fired. Trial Transcript at 185. Nor does the opinion mention that Mendez and the assailant conversed and interacted during the encounter. The assailant, who was sitting next to Mendez, asked her if she had money; Mendez replied that she thought she had five dollars; she found it in her purse and handed it to him. *Id.* at 188. And the opinion does not explain that most of the encounter did not take place in a "dark alley," but while driving out on the streets.[7]

As if her trial testimony weren't enough, however, Mendez's preliminary hearing testimony should settle the question of whether she got a good look at the assailant's face during the crime. That testimony reads:

Q: [by Daly, defense counsel]: But you were pretty scared. So how long were you with this person that you say was in the car?

A: [by Mendez]: Say about four, maybe five minutes.

Q: And you were sitting right next to him?

A: Yes.

Q: And you looked at his face while you were in the car?

A: Yes.

---

6. The majority asserts that the prosecutor had the duty to conduct additional live line-ups in order to mitigate the effect of the illegal line-up. Perhaps if the illegal line-up had been the sole pretrial identification, that argument would carry weight. I have never seen it suggested until now, however, that a prosecutor is so encumbered when a reliable photographic identification also exists. *See United States v. Johnson,* 820 F.2d 1065, 1072 (9th Cir.1987) (due process is preserved so long as some pretrial identification procedure is not impermissibly suggestive).

7. For that matter, there is no suggestion in the record that it was too dark for Mendez to see the assailant's features.

Q: You looked at his face when you got in the car?

A: Yes—not right when he got in the car, no.

Q: But during this time you did look at his face. Is that correct?

A: Yes.

Q: And sitting next to him, this would put you about one foot from his face. Is that correct?

A: About, yeah.

Preliminary Hearing Transcript at 47–48.

Nothing, absolutely nothing, in the record disputes Mendez's close-up and unobstructed view of the assailant's face. The fact that Tomlin raises nothing in the record to point out exactly how long Mendez may have looked directly at the assailant severely handicaps his attempt to meet his burden of showing prejudice. I cannot accept the majority's suggestion that there is something insignificant or unreliable about Mendez's observation of the assailant because she may not have "spent much time turned towards [the assailant], calmly noting his facial features and other aspects of his appearance." The time factor in any case is a relative matter. Indeed, any close-up look at a face could leave an indelible impression in the mind of a victim of a violent crime. The impression upon Mendez could arguably have been all the deeper in view of the fact that she witnessed the assailant fire a gun across her, shooting dead the man she loved. Preliminary Hearing Transcript at 12. Laying supposition aside, though: there is simply nothing here that supports the majority's degradation, and almost literal dismissal, of so vital an observation.

In *United States v. Monks,* 774 F.2d 945 (9th Cir.1985), the Ninth Circuit found sufficient indicia of reliability in the positive identifications by two tellers of a bank robber, even though the photographic line-ups were unduly suggestive. The robber was only two feet away from one teller, who looked at his face for about three to four minutes. That is less than the amount of time that Mendez had to view the assailant in this case. Be-

cause that teller interacted with the robber, as Mendez did with the assailant in this case, the court held that she was necessarily paying full attention to him. *Id.* at 956. The other teller observed the robber from a slightly greater distance ("between a customer and a teller") for about two minutes. The court held that her focus would necessarily be on the robber once she realized a robbery was taking place, just as Mendez's focus would be on the assailant once the episode involving her began. *Id.* In this case, however, the majority finds just the opposite—that because of the stress of the situation, Mendez was not attentive in her observation of the assailant. That presumption is wholly unjustified, and reverses the burden on Tomlin to show actual prejudice.

The hair style issue. This, in my view, is perhaps the best-directed point of the majority's prejudice analysis. Yet it, too, falls short. When Mendez described the assailant to the police soon after the attack, she said that he had an inch and a half to two inch afro. Tomlin, however, is said to have had a straightened, permanent, shoulder-length hair style at the time of the attack. The majority remarks that this discrepancy cannot be discounted. I do not agree.

During cross-examination at trial, Mendez testified that when she described the assailant's hair as an short afro, she was indicating how far it came out from the assailant's head, not whether his hair was straight or curly.[8] Trial Transcript at 210. Mendez's preliminary hearing testimony was consistent:

Q: [by Daly, defense counsel]: Well, you didn't say that possibly he had a short Afro, did you?

A: I don't believe so.

Q: You were pretty sure he had a short Afro, weren't you?

A: I didn't really look at his hair that much. I was just trying, you know, saying about how far the hair was, that is what it appeared.

Preliminary Hearing Transcript at 48–49.

In addition, at the state evidentiary hearing, the investigating and arresting officer,

---

**8.** In *Monks,* 774 F.2d at 956 n. 10 (9th Cir.1985), we accepted a witness's explanation of what she

meant by the term "pock marks" in her description of the defendant.

Detective Vincent, testified that at the time of Tomlin's arrest several days after the crime, he had his hair combed in such a way that it could look like a short natural in the dark. The majority admits that it is possible to comb shoulder-length straightened hair so that it looks like a short afro, but contends that the hair styles are vastly different. However, the record contains no evidence that Mendez's description was anything other than what she meant it to be, or that Tomlin's hair style was different than that at the time of the crime. Nor were we present to look for ourselves at the assailant's hair, or judge Mendez's and Vincent's credibility when they testified. Considering the record, the alleged hair style discrepancy very arguably is not a discrepancy at all.

Even assuming that the hair style discrepancy is material, it is not substantial enough to change the finding of an independent basis. The majority correctly cites the dangers inherent in eyewitness identification and the suggestiveness of pretrial identification, and points out that Mendez's testimony was crucial to the prosecution's case as it was presented. The testimony of a single uncorroborated witness, however, can be sufficient to support a conviction. *See United States v. Smith,* 563 F.2d 1361, 1363 (9th Cir.1977), *cert. denied,* 434 U.S. 1021, 98 S.Ct. 747, 54 L.Ed.2d 769 (1978). And, as the majority recognizes, a physical description need not be perfect to be reliable. In this case, where all of the other factors favor the reliability of Mendez's identification, the effect of the possible discrepancy in hair style must be considered inconsequential. *See United States v. Dring,* 930 F.2d 687, 693 (9th Cir.1991) (government agent's identification found reliable despite fact that he failed to identify suspect's beard), *cert. denied,* — U.S. ——, 113 S.Ct. 110, 121 L.Ed.2d 68 (1992); see also *United States v. Cook,* 464 F.2d 251, 253 (8th Cir.) (finding independent bases for in-court identification despite witnesses' descriptions of differences in hair color and length), *cert. denied,* 409 U.S. 1011, 93 S.Ct. 457, 34 L.Ed.2d 305 (1972).

Finally, the certainty of Mendez's identifications of Tomlin must also be considered. *Neil v. Biggers,* 409 U.S. at 199–200, 93 S.Ct.

at 382–83; *United States v. Gregory,* 891 F.2d 732, 735 (9th Cir.1989). A high degree of certainty about an identification is one of the most important considerations in the reliability determination. *Monks,* 774 F.2d at 956–57 (certainty at photo line-up and at trial). It is indisputable from the record before us that Mendez had no doubt regarding her identification of Tomlin. Without reservation, she picked him out of the nonsuggestive photographic line-up, and consistently reaffirmed the accuracy of that identification at the preliminary hearing and at trial.

Mendez had an undeniably excellent opportunity to view the assailant. She identified no other person besides Tomlin. She made a reliable identification of Tomlin in a photographic line-up. She never failed to identify Tomlin on any prior occasion. The lapse of time between the crime and the confrontation was short. There are no major discrepancies in Mendez's description and Tomlin's actual appearance. Even if the hair style description were inaccurate, it would be inconsequential in view of the other considerations. And Mendez could not have been any surer about her identifications. I have real difficulty holding that, under these circumstances, Mendez's in-court identification of Tomlin lacks an independent basis.

### IV.

Counsel was not ineffective for failing to raise the *Wade* issue. Nor has Tomlin demonstrated prejudice. Denial of the writ should be affirmed.

I fear that the majority decision will be a regrettable obstacle to jurists who must weigh legal burdens in claims of ineffective assistance of counsel, who must respect lower court findings, or who must decide whether an eyewitness identification should be undone by the perhaps inexact description of a single physical characteristic such as the way a suspect combs his hair.